UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LUBAVITCH-CHABAD OF ILLINOIS, INC.; LUBAVITCH-CHABAD OF EVANSTON, INC. d/b/a THE TANNENBAUM CHABAD HOUSE; and RABBI DOV HILLEL KLEIN, <br><br> Plaintiffs, <br> v. <br><br> NORTHWESTERN UNIVERSITY, TIMOTHY STEVENS, and PATRICIA TELLES-IRVIN, <br><br> Defendants. | Case No. 12-cv-7571 <br><br> Judge John W. Darrah |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, Lubavitch-Chabad of Illinois, Inc. ("Lubavitch"); Lubavitch-Chabad of Evanston, Inc. d/b/a The Tannenbaum Chabad House ("the Tannenbaum House"); and Rabbi Dov Hillel Klein ("Rabbi Klein") filed suit on September 21, 2012, alleging Defendants Northwestern University ("Northwestern"), Reverend Timothy Stevens, and Patricia Telles-Irvin violated Plaintiffs' rights under 42 U.S.C. §§ 1981, 2000A and 2000d. Defendants move for summary judgment on all of Plaintiffs' claims. The Motion has been fully briefed. For the reasons provided below, this Motion is granted.

### BACKGROUND

Local Rule 56.1(a)(3) requires a party moving for summary judgment to provide "a statement of material facts as to which the moving party contends there is no genuine issue . . . ." Local Rule 56.1(b)(3) requires the nonmoving party to admit or deny each factual statement proffered by the moving party and concisely designate any material facts that establish a genuine

dispute for trial. *See Schrott v. Bristol-Myers Squibb Co.*, 403 F.3d 940, 944 (7th Cir. 2005). A litigant's failure to dispute the facts set forth in an opponent's statement in the manner dictated by Local Rule 56.1 results in those facts' being deemed admitted for purposes of summary judgment. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). Local Rule 56.1(b)(3)(C) further permits the nonmovant to submit additional statements of material facts that "require the denial of summary judgment . . . ."

To the extent that a response to a statement of material fact provides only extraneous or argumentative information, this response will not constitute a proper denial of the fact, and the fact is admitted. *See Graziano v. Village of Oak Park*, 401 F. Supp. 2d 918, 937 (N.D. Ill. 2005). Similarly, to the extent that a statement of fact contains a legal conclusion or otherwise unsupported statement, including a fact which relies upon inadmissible hearsay, such a fact is disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997).

*The Parties*

The following facts[1] are taken from the parties' statements of undisputed material facts submitted in accordance with Local Rule 56.1. Lubavitch is an Illinois corporation. (Defs.' SOF ¶ 1.) The Tannenbaum House operates at 2014 Orrington Street in Evanston, Illinois. (Defs.' SOF ¶ 2.) Rabbi Klein is a resident of Evanston, Illinois, and has been the director and Rabbi of the Tannenbaum House since August 1985. (Defs.' SOF ¶ 3.) Northwestern is a private university with campuses in Evanston and Chicago, Illinois; it receives funding from the federal government. (Defs.' SOF ¶ 4; Pls' SOF ¶ 40.) Reverend Stevens has been Northwestern's

---

[1] Admitted Statements of Material Facts by Plaintiffs are designated as "Pls.' SOF" with the corresponding paragraph referenced; Admitted Statements of Material Facts by Defendants are designated as "Defs.' SOF" with the corresponding paragraph referenced.

Chaplain since 1986. (Defs.' SOF ¶ 6.) Telles-Irvin has been the Vice President of Student Affairs at Northwestern since July 1, 2011; her predecessor was Bill Banis. (Defs.' SOF ¶ 5; Pls.' SOF ¶ 1.) Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331, 1343(a), and 1367. (Defs.' SOF ¶ 7.)

*Religious Affiliation Policy*

Northwestern recognizes religious groups and religious centers. (Defs.' SOF ¶ 8.) All religious groups and religious centers and their respective representatives that wish to have access to Northwestern facilities or services must be recognized by Northwestern's Chaplain's office, as set forth in the policy entitled "Student Religious Organizations and Advisers at Northwestern University" (the "Religious Affiliation Policy"). (*Id.*) Official recognition is also referred to as affiliation. (*Id.*) Under the Religious Affiliation Policy:

> Recognition is a privilege accorded by the University. The University Chaplain may limit, suspend or withdraw recognition, or access to the University services or facilities, of any religious group, campus adviser, staff member or outside representative whenever, in his judgment, the polity [sic] set forth above has not been followed or whenever, in his judgment, it would be in the best interest of the University community. A decision of the Chaplain may be appealed to the Vice President of Student Affairs.

(Defs.' SOF ¶ 9.)

Currently, there are thirty-seven religious groups and five religious centers officially recognized by Northwestern. (Defs.' SOF ¶ 10.) The religious centers are: (1) the University Christian Ministry, (2) the University Lutheran Church at Northwestern, (3) the Sheil Catholic Center, (4) the Canterbury Episcopal Center at Northwestern, and (5) the Louis and Saeree Fiedler Hillel Center ("Fiedler Hillel Center"). (*Id.*) The Tannenbaum House was affiliated with Northwestern since, at least, 1985 until September 11, 2012. (Defs.' SOF ¶ 11.)

3

*Incidents Relating to the Tannenbaum House and Rabbi Klein*

In or about October 2001, Northwestern administrators became aware of students under the age of 21 who returned to their residence halls and vomited due to alcohol consumption after attending a Simchat Torah party at the Tannenbaum House. (Defs.' SOF ¶ 13.) One student was transported to the hospital due to excessive alcohol consumption after having attended a party at the Tannenbaum House. (*Id.*) Reverend Stevens, the Chaplain, learned that one of those students was reported to have consumed six or seven shots of alcohol. (Defs.' SOF ¶ 14.) Following the underage drinking incidents, Reverend Stevens met with Rabbi Klein and discussed the need for proper controls with respect to the service of alcohol. (Defs.' SOF ¶¶ 15-16.)

On April 1, 2005, Rabbi Klein held a dinner to celebrate his son's Bar Mitzvah at the Allison Dining Hall, located on the Northwestern campus. (Defs.' SOF ¶ 17.) Alcohol was served at this dinner, and some Northwestern students attended the dinner, along with Rabbi Klein's son and his friends, who were under the age of 21. (*Id.*) When Rabbi Klein completed a form to reserve a room in the Allison Dining Hall, he indicated that no alcohol would be served at the event. (Defs.' SOF ¶ 18.) Reverend Stevens later learned that hard liquor, including whiskey and vodka, was served at the dinner. (Defs.' SOF ¶ 19; Pls.' SOF ¶ 9.) Following the dinner, Reverend Stevens again met with Rabbi Klein to discuss the issue of alcohol at events on campus. (Defs.' SOF ¶ 20.) After that meeting, Rabbi Klein apologized to Garth Miller, the Director of Housing and Food Services, for there being alcohol at the dinner. (Defs.' SOF ¶ 21.)

Later, in 2005, Rabbi Klein met with then-Vice President of Student Affairs Bill Banis, Stevens, and then-Assistant Vice President of Student Affairs and Dean of Students Mary Desler.

4

(Defs.' SOF ¶ 22.) Rabbi Klein was again cautioned about responsible alcohol consumption at his events. (*Id.*)

Between 2001 and July 1, 2012, alcohol was served to Northwestern students, including underage students, at the Tannenbaum House. (Defs.' SOF ¶ 24.) Specifically, alcohol was served there on the following occasions: Shabbat dinners held every Friday night, and Jewish holidays, including Passover, Sukkot, Shavuot, Rosh Hashana, Purim, Simchat Torah, and Tu B'Shevat. (*Id.*) Students attending the Shabbat dinners at the Tannenbaum House, where alcohol was served, were not asked to present identification reflecting their ages and were offered "brown or white shots," meaning vodka or scotch. (Defs.' SOF ¶ 25.) Rabbi Klein testified that it would be against Jewish law for him to require students to carry identification on Shabbat. (*Id.*) Students attending celebrations of Rosh Hashana, Sukkot, Tu B'Shevat, Passover, and Shavuot were not asked to present identification reflecting their ages. (Defs.' SOF ¶ 26.) During this time period, during Purim and Simchat Torah celebrations, Rabbi Klein hired one bartender for the approximately 75 to 300 individuals who attended the celebrations at the Tannenbaum House. (Defs.' SOF ¶ 27.) Rabbi Klein did not monitor the consumption of alcohol at these celebrations, and he drank alcohol at these events in the presence of students. (Defs.' SOF ¶¶ 28-29.)

*Terminating the Affiliation with Northwestern*

On June 22, 2012, Reverend Stevens received a call from Rabbi Jack Moline, a Northwestern alumnus and parent of Max Moline, a Northwestern graduate, who expressed concern regarding the use of alcohol at Tannenbaum House and by Klein. (Defs.' SOF ¶ 30.) Rabbi Moline also expressed to Reverend Stevens that he had theological differences with Rabbi Klein and with the teachings and practices of the Lubavitch movement. (Pls.' SOF ¶ 7.)

5

Telles-Irvin spoke to Reverend Stevens about his conversation with Moline and, thereafter, began an investigation into the concerns raised by Moline. (Defs.' SOF ¶ 31.)

Telles-Irvin called her decision to commence an investigation a "slight departure" from the rules, which gave that responsibility to Reverend Stevens. (Pls.' SOF ¶ 5.) Telles-Irvin met with at least twelve people during the course of her investigation, including Reverend Stevens; Dominic Greene, Director of Fraternity and Sorority Life; and Rabbi Simon, Director of the Fiedler Hillel Center. (Pls.' SOF ¶¶ 12, 16.) Telles-Irvin did not contact Rabbi Klein or his supervisor during the investigation. (Pls.' SOF ¶ 19.) The only student Telles-Irvin spoke to during her investigation was Max Moline. (Pls.' SOF ¶ 12.) During the course of her investigation, Telles-Irvin reviewed Northwestern's documentation, dating back to 2001, regarding alcohol incidents in connection with the Tannenbaum House. (Defs.' SOF ¶ 34.) This documentation included a police report, documenting an incident involving an underage student who was transported to the hospital for an alcohol-related illness after attending a party at the Tannenbaum House. (*Id.*) The Tannenbaum House, according to the police report, had been serving alcohol in celebration of the Jewish High Holiday. (*Id.*) In 2005, a blog post was discovered, which stated Rabbi Klein had offered "brown and white" to students at the Tannenbaum House, which Telles-Irvin understood to mean whiskey and vodka. (Pls.' SOF ¶ 11.) The blog further stated Rabbi Klein was "tres into underage drinking." (Pls.' SOF ¶ 11.) Telles-Irvin did not speak to the author of the blog. (Pls.' SOF ¶ 11.) As a result of the investigation, Reverend Stevens and Telles-Irvin determined that Northwestern should cease its affiliation with Rabbi Klein, though Telles-Irvin made the final decision. (Defs.' SOF ¶ 35; Pls.' SOF ¶ 5.)

Telles-Irvin and Reverend Stevens met with Rabbi Klein and asked him to leave the Tannenbaum House; Telles-Irvin and Reverend Stevens explained that Northwestern could no longer affiliate with the Tannenbaum House while Rabbi Klein was the representative of the organization. (Defs.' SOF ¶ 36.) On July 31, 2012, Telles-Irvin sent a letter to Rabbi Klein's superior, Rabbi Daniel Moskowitz, explaining the issues involving Rabbi Klein's regularly serving alcohol to underage students, excessive consumption of alcohol by students at the Tannenbaum House, and reports that Rabbi Klein had been observed intoxicated on various occasions. (Defs.' SOF ¶ 37.) In this letter, Telles-Irvin reiterated that Northwestern could no longer affiliate with the Tannenbaum House while Rabbi Klein was the representative of the organization. (*Id.*)

Rabbi Moskowitz met with Reverend Stevens and Telles-Irvin on August 6, 2012, to discuss the contents of the July 31 letter. (Defs.' SOF ¶ 38.) In that meeting, Telles-Irvin reiterated Northwestern's position that it would disaffiliate with the Tannenbaum House as long as Rabbi Klein remained its representative. (*Id.*) Rabbi Moskowitz indicated he would inform Northwestern of his decision with respect to Rabbi Klein's tenure at the Tannenbaum House by the end of the month. (*Id.*) Rabbi Klein was sent a letter on September 11, 2012, from Telles-Irvin and Reverend Stevens, informing him of Northwestern's decision to disaffiliate with the Tannenbaum House. (Defs.' SOF ¶ 39.)

*Klein's Role After Disaffiliation*

For many years, Rabbi Klein has led groups of Northwestern students on "Birthright Israel" trips, which is a program that is operated by an organization independent from Northwestern. (Defs.' SOF ¶ 40.) In or about December 2012, Rabbi Klein led a group of Northwestern students on a Birthright Israel trip. (Defs.' SOF ¶ 41.) Prior to Northwestern's

7

decision to disaffiliate from the Tannenbaum House, Rabbi Klein served as the faculty advisor for the Alpha Epsilon Pi fraternity. (Defs.' SOF ¶ 42.)

He also was engaged as a consultant for the Kosher food program at the Allison Dining Hall. (Defs.' SOF ¶ 43.) On December 7, 2011, the Tannenbaum House had entered into a contract with Sodexo, whereby Sodexo retained the Tannenbaum House to provide certain Kosher-related services to Northwestern (the "Consulting Agreement"). (Defs.' SOF ¶ 44.) Under the terms of the Consulting Agreement, the services of the Tannenbaum House were provided on an "as needed basis" with no promise of any specific amount of work. (Defs.' SOF ¶ 45.) The term of the Consulting Agreement was from December 1, 2011 through August 31, 2012. (Defs.' SOF ¶ 46.) The Consulting Agreement permitted either party to terminate the Consulting Agreement "at any time upon thirty (30) days' written notice to the other party" and did not include a right to renew. (Defs.' SOF ¶ 47.) Once Northwestern disaffiliated with the Tannenbaum House, Rabbi Klein was told he could not service the Sodexo contract any more. (Pls.' SOF ¶ 38.) Neither the Consulting Agreement nor any other contract between Plaintiffs and Sodexo or Plaintiffs and Northwestern was in effect at the time of Northwestern's disaffiliation with the Tannenbaum House. (Defs.' SOF ¶ 49.)

Rabbi Klein is not banned from campus and is able to access any places on campus that are generally open and accessible to the public. (Defs.' SOF ¶ 50.) Northwestern students are not barred from attending the Tannenbaum House events and the students continue to attend events at the Tannenbaum House. (Defs.' SOF ¶ 51.) Rabbi Klein continues to conduct religious programming and Shabbat dinners at the Tannenbaum House. (Defs.' SOF ¶ 52.)

*Other Religiously Affiliated Organizations*

The Sheil Catholic Center and the University Lutheran Church serve a small amount of sacramental wine during worship services. (Defs.' SOF ¶ 54.) During Masses at the Sheil Catholic Center, communion wine is mixed with water and communicants receive only a small sip of the wine/water mix from a chalice that is held by a Eucharistic minister, who is never a student. (*Id.*) Defendants are not aware of any occasion during which anyone underage has consumed more than a sip of this wine/water mix. (*Id.*) There are four Masses each weekend at the Sheil Catholic Center, each attended by several hundred people; there are also daily Masses attended by approximately ten to thirty people. (*Id.*) During the Sunday worship service at the University Lutheran Center, communicants receive either a small sip of wine from a chalice or can choose to have wine poured into a small disposable cup in order to receive communion. (*Id.*) In these services at the Sheil Catholic Center and the University Lutheran Center, the amount of wine received by the communicant is approximately one teaspoon. (*Id.*)

During worship services at the Canterbury Episcopal Center, communicants used to receive a small sip of wine from a single chalice. (Defs.' SOF ¶ 55.) Until approximately 2002, the Alice Millar Chapel and Religious Center, which is located on Northwestern property and part of Northwestern, served a small amount of sacramental wine during worship services. (Defs.' SOF ¶ 56.) The sacramental wine was served by intinction, which means that the Eucharistic bread was dipped into a chalice containing the sacramental wine. (*Id.*) The Alice Millar Chapel and Religious Center began to serve grape juice instead of sacramental wine in approximately 2002. (*Id.*)

Northwestern has always understood that the sacramental wine served by these institutions described above was served with the proper controls solely for religious purposes. (Defs.' SOF ¶ 57.)

*Northwestern Hierarchy and Disciplinary Procedures*

All student organizations, including fraternities, sororities, and individual students, are subject to the Student Code of Conduct and are disciplined by the Office of Student Conduct and Conflict Resolution. (Defs.' SOF ¶ 58.) Religious centers, like the Tannenbaum House prior to September 11, 2012, are not subject to the Student Code of Conduct and are not disciplined by that Office. (*Id.*) Non-religious student organizations are not subject to Northwestern's Religious Affiliation Policy. (Defs.' SOF ¶ 59.)

Telles-Irvin reorganized the various offices that handle student life during the 2011-2012 academic school year. (Pls.' SOF ¶ 2.) Northwestern's policy regarding underage drinking at fraternities and sororities has not changed since Telles-Irvin joined the staff. (Pl.s' SOF ¶ 4.) Allegations made against religious affiliated organizations would be heard by Reverend Stevens. (Pls.' SOF ¶ 3.) Appeals of Reverend Stevens's decisions would go to Telles-Irvin, who was the final level of appeal concerning religiously affiliated organizations. (Pls.' SOF ¶ 3.)

When Northwestern is aware of an incident involving a violation of the Student Code of Conduct, the student or organization alleged to be involved receives a letter from the Office of Student Conduct and is required to attend a meeting with a representative from that office. (Defs.' SOF ¶ 60.) After that meeting, the Office of Student Conduct or the Dean of Students makes a decision regarding the discipline of the student or student organization involved in the incident. (*Id.*)

Sometimes, this process results in the filing of a formal complaint against the student or group of students pursuant to the University Hearing and Appeals System ("UHAS"). (*Id.*) Those subject to a UHAS complaint are entitled to a formal hearing before the University Hearing and Appeals Board, which is comprised of trained students, faculty, and staff members. (*Id.*) The Board makes a decision regarding appropriate disciplinary measures, and that decision can be appealed to the appeals panel of the Board. (*Id.*) A UHAS complaint can only be initiated against students or student organizations and cannot be initiated against faculty, staff, or any other non-students affiliated with Northwestern, including religious centers and their non-student representatives. (Defs.' SOF ¶ 61.) Reverend Stevens does not make decisions relating to the discipline of individual students and student organizations, including fraternities and sororities; and Telles-Irvin is generally not involved in the disciplinary process relating to students or student organizations. (Defs.' SOF ¶¶ 64-65.)

Defendants are not aware of any student organization, including any fraternity or sorority, in which a non-student adult representative of the organization was alleged to have a pattern of providing alcohol to underage students. (Defs.' SOF ¶ 62.) Plaintiffs' only basis for claiming that Northwestern wrongfully disaffiliated with the Tannenbaum House is the unsubstantiated statement that other campus organizations committed the same acts as Plaintiffs but were not subject to disaffiliation.[2] (Defs.' SOF ¶ 53.)[3]

---

[2] Plaintiffs seek to include as Additional Statements of Material Facts various accounts, culled from disciplinary letters issued by Northwestern's Associate Vice President for Student Affairs and Dean of Students, Mary Desler, that describe and admonish underage drinking activities and other transgressions committed by sororities, fraternities, and student athletic teams at Northwestern. Defendants move to strike these statements on the basis that they fail to meet the requirements of being "short numbered paragraphs" and, in many cases, are inadmissible hearsay. Accordingly, Defendants' Motion to Strike is granted in part; and Paragraphs 28-36 are stricken.
11

**LEGAL STANDARD**

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). If the moving party meets this burden, the nonmoving party cannot rest on conclusory pleadings but, rather, "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986)). A mere scintilla of evidence is not enough to oppose a motion for summary judgment, nor is a metaphysical doubt as to the material facts. *Robin v. Espo Eng. Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (citations omitted). Rather, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In considering a motion for summary judgment, the court views the evidence in a light most favorable to the nonmoving party, drawing all reasonable inferences in the nonmoving party's favor. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (citing *Anderson*,

---

[3] "When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion." *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (citing *Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir. 2003)).

477 U.S. at 255). The court does not make credibility determinations or weigh conflicting evidence. *Id.*

## ANALYSIS

*Count II – 42 U.S.C. § 2000A – Title II of the Civil Rights Act of 1964*

Count II of Plaintiffs' Complaint alleges Defendants' decision to disaffiliate with the Tannenbaum House constituted a violation of Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a, which provides that "[a]ll persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation . . . without discrimination or segregation on the ground of race, color, religion, or national origin." 42 U.S.C. § 2000a(a). However, Plaintiffs indicate, in their Response, that they are only proceeding on Counts I and III of the Complaint. Accordingly, Defendants' Motion for Summary Judgment is granted as to Count II.

*Count I – 42 U.S.C. § 1981*

Count I of Plaintiffs' Complaint asserts a violation of 42 U.S.C. § 1981 on the part of Defendants: specifically, that Northwestern's "decision to prevent Rabbi Klein, and the Tannenbaum Chabad House from contracting with Sodexo, Birthright Israel, and Alpha Epsilon Pi, violates 42 U.S.C. § 1981." (Compl. ¶ 21.) Section 1981 provides that all persons within the jurisdiction of the United States "shall have the same right . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a). To make and enforce a contract "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. §1981(b).

13

"Section 1981 prohibits race discrimination in the making and forming of contracts." *Smiley v. Columbia College Chicago*, 714 F.3d 998, 1002 (7th Cir. 2013) (citing *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011)). "The legislative history of the statute clearly indicates that Congress intended to protect a limited category of rights, specifically defined in terms of racial equality. Thus, Section 1981 does not protect against discrimination based on sex or religion or age." *Anooya v. Hilton Hotels Corp.*, 733 F.2d 48, 49-50 (7th Cir. 1984) (internal quotation omitted). Because Plaintiffs allege *religious* discrimination against them on the part of Defendants, Defendants reason, Plaintiffs' claim on that basis under Section 1981 must fail. Plaintiffs argue, for the first time in their Response to the Motion for Summary Judgment, that "if there was discrimination against them, it was on the basis of their identification with a peculiar race or ethnicity." (Pls.' Resp. at 9.)

Beyond asserting a claim under Section 1981, nothing on the face of Plaintiffs' Complaint demonstrates any allegation of racial or ethnic discrimination whatsoever. To the contrary, Plaintiffs assert the action is a civil action "for Defendant's [sic] discrimination against the Chabad Chassidism and the Jewish faith." (Compl. ¶ 1.) Plaintiffs alleged "Chabad had to litigate its right to practice religion freely . . . . Today, Chabad once again has to fight for that right" and, further, that Northwestern "claims that it offers a wide variety of religious worship and community options but it is discriminating against Chabad and the Jewish faith." (Compl. ¶¶ 5, 8.) Plaintiffs claim that the only reasons offered for Northwestern's disaffiliation with the Tannenbaum House "were wholly pretextual and meant to single out Chabad against all other faiths for removal from Northwestern University." (Compl. ¶ 14.)

Moreover, nothing from the undisputed (or disputed) material facts demonstrates any indication that the discrimination alleged here was predicated on Plaintiffs' race or ethnicity.

14

Plaintiffs refer to Nazi Nuremberg laws and quotations from the Bible in an effort to demonstrate the concept of Jewish ethnicity. (Pls.' Resp. at 8.) However, accepting this basic premise and viewing the evidence in a light most favorable to Plaintiffs, no facts have been put forth, or even alleged, which could support a reasonable jury's returning a verdict favorable to Plaintiffs on the basis of racial or ethnic discrimination. *See Pugh*, 259 F.3d at 625. For these reasons, Defendants' Motion for Summary Judgment is granted as to Count I of the Complaint.

*Count III – 42 U.S.C. § 1981*

Count III of Plaintiffs' Complaint asserts Defendants' decision to disaffiliate with the Tannenbaum House constitutes impermissible and unconscionable discrimination against Plaintiffs on the basis of their religion in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. (Compl. ¶ 30.) The claim is alleged against all Defendants in the Complaint; but, in response to the Motion for Summary Judgment, Plaintiffs concede that "Defendants correctly point out that the individual Defendants, Patricia Telles-Irvin and Rev. Tim Stevens, are not proper parties under Title VI." (Pls.' Resp. at 1 n.1.) Accordingly, this claim is dismissed as to Defendants Telles-Irvin and Reverend Stevens.

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of or be subjected to discrimination under any program or activity receiving federal financial assistance." 42 U.S.C. § 2000d. Like Section 1981, Title VI does not provide for protection against discrimination on the basis of religion – only race, color, or national origin. As described above, relating to the Section 1981 claim, Plaintiffs never assert they are discriminated on the basis of their ethnicity or race – the entirety of the facts alleged in the Complaint and presented in response to the Motion for Summary Judgment hinge on Plaintiffs' assertions that they were

discriminated against on the basis of their religion. Indeed, in Count III, the Title VI claim, Plaintiffs specifically allege Northwestern's actions constitute discrimination "against the Plaintiffs **solely** on the basis of their religion." (Compl. ¶ 30) (emphasis added). Moreover, Plaintiffs are unsuccessful in their attempt at this late stage in the proceedings to recharacterize this claim as one precipitated by race or ethnic discrimination. For these reasons, Defendants' Motion for Summary Judgment as to Count III of the Complaint is granted.

*No Showing of Intentional Discrimination*

Finally, even if Plaintiffs' discrimination claims were permitted to go forward, despite Plaintiffs' failure to allege ethnic or racial discrimination, Plaintiffs have not demonstrated a *prima facie* case of discrimination under Title VI or Section 1981.[4]

Discrimination may be demonstrated under the direct method or indirect method. *Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 393 (7th Cir. 2010). To demonstrate discrimination under the direct method, Plaintiffs must provide "direct evidence of – or sufficient circumstantial evidence to allow an inference of – intentional racial discrimination . . . ." *Id.* (citing *Coffman v. Indianapolis Fire Department*, 578 F.3d 559, 563 (7th Cir. 2009)). While "[d]irect evidence typically requires an admission of discriminatory animus," "a plaintiff may also produce circumstantial evidence that establishes . . . discriminatory motive through a longer

---

[4] Considering claims of religious discrimination under Title VI and Section 1981 requires essentially the same analysis; therefore, these claims are taken together, as the underlying facts asserted are identical for Counts I and III of the Complaint. *See Piggee v. Columbia Sussex Corp.*, Case No. 2:08-CV-107-PPS, 2012 WL 4157405, at *5 (N.D. Ind. Sept. 18, 2012) ("The analysis under both Title II and Section 1981 is essentially the same . . . ."); *Brewer v. Board of Trustees of the University of Illinois*, 479 F.3d 908, 921 (7th Cir. 2007) ("The elements of a *prima facie* case are the same under both Title VI and VII."); *Friedel v. City of Madison*, 832 F.2d 965, 971 (7th Cir. 1987) ("When the plaintiff alleges intentional discrimination . . . it is clear that the same standards in general govern liability under Sections 1981, 1983, and Title VII.").

16

chain of inferences." *Mach v. Will County Sheriff*, 580 F.3d 495 (7th Cir. 2009) (citations omitted). Here, Plaintiffs provided no evidence of any direct admissions or demonstrations of discriminatory intent relating to Northwestern's decision to disaffiliate with the Tannenbaum House. Additionally, Plaintiffs fail to provide any circumstantial evidence which would support an inference that the disaffiliation was a result of Defendants' discrimination against Plaintiffs.

To demonstrate discrimination under the indirect method, Plaintiffs must show they (1) were members of a protected class, (2) met the school's legitimate expectations, (3) suffered an adverse action, and (4) were treated less favorably than similarly situated individuals outside of the protected class. *Brewer v. Board of Trustees of the University of Illinois*, 479 F.3d 908, 915 (7th Cir. 2007).

Assuming Plaintiffs had sufficiently demonstrated they are members of classes protected by Section 1981 and Title VI, they fail to meet the fourth element. Plaintiffs fail to identify similarly situated individuals or groups of individuals treated differently than Plaintiffs. Plaintiffs listed numerous examples of fraternities and sororities with disciplinary actions relating to underage drinking. However, Plaintiffs are comparing apples to oranges, as the sororities and fraternities are organized and handled very differently than the religious centers affiliated with Northwestern, which once included the Tannenbaum House. These other religious centers have not been disaffiliated with Northwestern and, therefore, Plaintiffs argue, were treated more favorably than the Tannenbaum House.

Even if one were to generously assume Plaintiffs had met the four *prima facie* elements of discrimination, the burden shifts to Defendants, who have offered a legitimate, nondiscriminatory reason for the disaffiliation with the Tannenbaum House: reports and concerns of excessive or underage drinking with a non-student adult religious leader who was

17

intoxicated in the presence of students and serving more than nominal amounts of sacramental wine. This was a legitimate reason for Northwestern to determine it was necessary to disaffiliate with the Tannenbaum House.

The burden then shifts back to Plaintiffs, who must "demonstrate that the suggested reason is mere pretext for discrimination." *Brewer*, 479 F.3d at 915. "In order to be pretextual, the proffered reasons must be a lie; we look to whether the . . . reasons for its decision are honest and genuinely motivated." *Burks v. Wisc. Department of Transportation*, 464 F.3d 744, 754 (7th Cir. 2006) (internal quotations and citations omitted). It is clear from the record that Defendants' reasons for disaffiliation with the Tannenbaum House were genuine. After repeatedly issuing warnings concerning underage drinking, Defendants commenced an investigation regarding the issue of underage and excessive drinking at the Tannenbaum House and determined that it would be appropriate to disaffiliate with it. It was for those reasons, and not because of Plaintiffs' religious beliefs or ethnic backgrounds, that Defendants disaffiliated with the Tannenbaum House.

## CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment [40] is granted. Defendants' Motion to Strike [81] is granted with respect to Paragraphs 28-36 of Plaintiffs' Rule 56.1(b) Statement.

Date:   December 19, 2013            _____
                                      JOHN W. DARRAH
                                      United States District Court Judge

18